## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

M.S. *ex rel.* M.C.S. and D.A., *et al.*,

    *Plaintiffs*,

    v.

MONIFA B. MCKNIGHT, *et al.*,

    *Defendants*.

Civil No. 23-2727 ABA

## MEMORANDUM OPINION & ORDER

M.S. is a middle schooler who lives in Montgomery County, Maryland, and qualifies for special education services under the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§ 1400 *et seq*. From M.S.'s kindergarten through fifth-grade years, her parents, M.C.S. and D.A., worked with the Montgomery County Public Schools ("MCPS") to ensure that the school system delivered appropriate educational services to their daughter. But when the time came for M.S. to choose a middle school, her parents did not consider MCPS's offerings sufficient. The parents sent M.S. to two therapeutic boarding schools in North Carolina, one for the summer before M.S.'s sixth-grade year, the other for sixth grade. After that, her parents moved M.S. to a private day school in Virginia for seventh grade.

M.S.'s parents sought reimbursement from MCPS for the tuition and expenses of those private-school placements. They argued that MCPS could not provide their daughter with a free appropriate public education ("FAPE") and thus that MCPS should cover those costs. An administrative-law judge ("ALJ") for the State of Maryland disagreed and denied them such relief.

Now, before this Court, M.S.'s parents, individually and on her behalf ("Plaintiffs"), assert two claims in a motion for summary judgment: (1) as before, that MCPS violated the IDEA by not providing M.S. with a FAPE, and (2) that the ALJ erred in her factual findings and legal analysis. *See* ECF No. 24-1 at 1.[1] Defendants are the Montgomery County Board of Education and Dr. Monifa McKnight, superintendent of MCPS, sued in her official capacity (together, "Defendants"). Defendants filed a cross-motion for summary judgment. ECF No. 26. Plaintiffs opposed that motion, ECF No. 27, and MCPS replied, ECF No. 30. The Court then heard argument on the motions, ECF No. 32, and the parties submitted supplemental briefing, ECF Nos. 36, 37.[2]

Giving due weight to the ALJ's factual findings and based on this Court's de novo review of the record, the Court finds that the IEPs and the proposed placements within MCPS were reasonably calculated to provide M.S. with a FAPE for each year at issue, and thus the IDEA did not require MCPS to pay for M.S. to attend private school. Accordingly, the Court will deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

---

[1] All page citations to filings correspond to the ECF pagination, which may not be identical to the pagination used by the parties.

[2] A hearing was held on October 2, 2024, before the Honorable Peter J. Messitte. After the hearing and the submission of supplemental briefing, Judge Messitte unexpectedly passed away. The case was then transferred to me. As required under the circumstances, I certify that I am familiar with the record of this case, having read all relevant filings, the underlying administrative decision, and the transcript of the hearing before Judge Messitte. *See* Fed. R. Civ. P. 63; *id.* advisory committee's note to 1991 amendment; *see also Patelco Credit Union v. Sahni*, 262 F.3d 897, 905–06 (9th Cir. 2001); *In re Reale*, 584 F.3d 27, 32 (1st Cir. 2009).

# I. BACKGROUND

## A. The Individuals with Disabilities Education Act

The IDEA entitles children with disabilities to a free appropriate public education. 20 U.S.C. § 1412(a)(1).[3] Where a student is entitled to "special education and related services," *id.* § 1401(9) (defining a FAPE), the IDEA requires that a school district provide "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability," *id.* § 1401(29), as well as "the support services 'required to assist a child . . . to benefit from' that instruction." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (quoting 20 U.S.C § 1401(26)). Though a FAPE does require *special* education, a FAPE "is not synonymous with the *best possible* education." *G.M. ex rel. E.P. v. Barnes*, 114 F.4th 323, 342 (4th Cir. 2024) (emphasis added) (quotation omitted).

A State must provide a qualifying child with a FAPE if that State receives federal funds for special education. *See G.M.*, 114 F.4th at 329. Maryland is such a State. Md. Code, Educ. § 8-403 (2024). To "tailor[ a FAPE] to the unique needs" of a child, *Endrew F.*, 580 U.S. at 391, Maryland convenes a team comprising the child's parents, general-education teachers, special-education teachers, and other education professionals, *see* 20 U.S.C. § 1414(d)(1)(B). This team creates a comprehensive plan for the child, called an individualized education program, or IEP. *See id.* §§ 1401(9)(D), 1414; *accord* Md. Code Regs. 13A.05.01.06–.09. The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S.

---

[3] To ensure all such children can receive a FAPE, both the federal government and Maryland enforce certain regulations. 34 C.F.R. §§ 300 *et seq.* (2024); Md. Code Regs. 13A.05.01 (2022).

at 399 (quotation omitted). And the IEP must aim to deliver the FAPE in the "least re-strictive environment." 20 U.S.C. § 1412(a)(5); Md. Code Reg. 13A.05.01.10. That is, "[t]o the maximum extent appropriate, children with disabilities . . . [should be] edu-cated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A).

Of course, "parents and educators will not always agree" on what the IEP should include. *G.M.*, 114 F.4th at 330 (citation omitted). When this happens, parents may ei-ther mediate with the school or file a complaint to be heard, first in a preliminary meet-ing, then, if issues persist, at a due process hearing before a state educational agency. *See* 20 U.S.C. § 1415(e)–(g). In Maryland, the Maryland Office of Administrative Hear-ings holds such hearings. Md. Code, Educ. § 8-413; Md. Code Regs. 13A.05.01.15(C). "Once those state procedures are exhausted, the IDEA authorizes any party aggrieved by the hearing officer's determination to file a civil suit in federal court." *G.M.*, 114 F.4th at 330 (citing 20 U.S.C. § 1415(i)(2)(A)); *accord* Md. Code Regs. 13A.05.01.15(C)(20) ("A party aggrieved by the findings and decision of a due process hearing may bring a civil action in State or federal court."); Md. Code, Educ. § 8-413(j).

At both the administrative hearing and before the court, the parents bear the bur-den of proof. *See Weast v. Schaffer ex rel. Schaffer*, 377 F.3d 449, 456 (4th Cir. 2004) ("[P]arents who challenge an IEP have the burden of proof in the administrative hear-ing."); *Bd. of Educ. of Montgomery Cnty. v. Hunter ex rel. Hunter*, 84 F. Supp. 2d 702, 705 (D. Md. 2000) ("[P]arties aggrieved by the administrative decision may file suit in federal district court, [and] [t]he burden of proof is on the party challenging the admin-istrative decision.").

Where parents believe the IDEA entitles their child to a private placement, they need not wait to enroll the child in such a program; they may place their child in a

private school and request tuition reimbursement from the State. *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993). But the State is only required to reimburse the parents "if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Id.*

## B. Facts

The following statement of facts relies on the ALJ's findings of fact, findings the Court accepts as true. *See infra* § III(A)(1); *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).

M.S. is a middle schooler who lives in Montgomery County, Maryland. ALJ Decision, Findings of Fact (ALJ Facts) ¶ 1 (Aug. 25, 2023). Her relevant diagnoses include autism-spectrum disorder; attention-deficit/hyperactivity disorder; a "specific learning disability" impairing her reading fluency; major depressive disorder with anxious distress, which, at the time of the ALJ finding, was in partial remission; binocular-vision dysfunction; sensory-processing issues; a developmental-coordination disorder; and hypermobile Ehlers-Danlos syndrome. *Id.* ¶ 2.

### *1. Initial Diagnoses at Bethesda Elementary and the Onset of Mental Health Issues*

In September 2016, M.S. started kindergarten at Bethesda Elementary School, a public elementary school in Montgomery County. *Id.* ¶ 3. Toward the end of that school year, M.S.'s parents prompted MCPS to evaluate M.S.'s speech and language abilities. *Id.* ¶ 4. The evaluation led MCPS to recommend speech therapy for M.S. *Id.* The parents agreed, so MCPS developed an IEP for M.S., listing speech-language impairment as her primary disability. *Id.*

In October 2018, early into her second-grade year, M.S. began experiencing sig-
nificant mental health challenges, reporting a depressed mood and suicidal ideations
while also exhibiting self-harming behavior including hitting her head on the wall. *Id.*
¶ 5. She was only eight. *Id.* By November, she required adult support throughout the
school day, prompting her IEP team to reevaluate. *Id.* ¶ 6. During the reevaluation
meeting, M.S.'s mother reported that M.S. was becoming increasingly self-critical, expe-
riencing mood dysregulation and separation anxiety, and expressing suicidal thoughts.
*Id.* ¶ 6.

MCPS responded by conducting educational assessments in November and De-
cember 2018 to evaluate her progress in reading comprehension, decoding, writing, and
mathematics. *Id.* ¶ 7. Concurrently, her parents sought help from multiple mental health
professionals, resulting in diagnoses of anxiety, depression, disruptive-mood-dysregula-
tion disorder, and ADHD. *Id.* ¶ 8. Following MCPS's reevaluation of M.S., the IEP team
added special-education services to her IEP and removed speech-language impairment
as M.S.'s primary disability. *Id.* ¶ 11.

M.S. had a rough start of her third-grade year. *See id.* ¶ 12. During the first week
of school, the school environment overwhelmed M.S. who, at one point, attempted to
block out classroom noise by sticking a pencil in her ear. *Id.* ¶ 12. M.S. parents took M.S.
to her therapist. *Id.* ¶ 13. The therapist, in turn, recommended the parents enroll M.S. in
a partial hospitalization program at Dominion Hospital. *Id.* They tried to, but when they
spoke to hospital staff, the "staff indicated that they would only admit [M.S.] for a full
hospitalization." *Id.* So M.S. was hospitalized for ten nights, followed by another three
weeks in a partial hospitalization program. *Id.* ¶ 14. Afterward, she received home in-
struction from MCPS for about two months. *Id.* ¶ 15.

### 2. *Westbrook Elementary and the Mental Health Challenges of COVID*

In December 2019, about halfway through M.S.'s third grade year, her IEP team determined that she should transfer to the Social Emotional Special Education Services (SESES) program at Westbrook Elementary School. *Id.* ¶ 17. This program featured three small, self-contained social-emotional learning classrooms, serving students with both externalizing and internalizing behaviors. *Id.* ¶ 18.

In mid-January 2020, M.S. began at Westbrook's SESES program. *Id.* ¶ 19. Then, COVID hit. *Id.* ¶ 20. In March, MCPS closed its schools for in-person instruction, and in April, M.S., like all MCPS students, began online learning. *See id.* ¶¶ 20–21. The anxiety induced by COVID and the school closure distressed M.S., so much that she told her parents that she planned to kill herself. *Id.* ¶ 22. Her parents immediately took her to Sheppard Pratt Hospital where she stayed for two weeks. *Id.* After a week at home, she was hospitalized again, this time in a partial hospitalization program at Dominion Hospital, and then, a few weeks later, she was hospitalized yet again. *See id.* ¶¶ 23–24.

For her fourth-grade school year, 2020 to 2021, M.S. continued in the SESES program at Westbrook. *Id.* ¶ 25. Her November 2020 IEP identified M.S.'s primary disability as both a "specific learning disability" and an "other health impairment." *Id.* Under M.S.'s IEP, MCPS placed M.S. in a self-contained classroom—one with only students who receive special education—for core subjects (math, reading, writing) but in general education for lunch, recess, specials, science, and social studies. *Id.* In addition, MCPS provided thirty minutes of counseling each week and four 30-minute sessions of social-work services. *Id.*

Despite this support, M.S. still showed challenging behaviors. *See id.* ¶¶ 26–27. At home she frequently threw tantrums, some lasting two hours. *Id.* ¶ 27. These episodes, often triggered by transitions or by activities she did not want to do, included suicidal threats, screaming, hysterical crying, and aggressive behavior. *Id.* And they happened two to three times each week. *Id.* M.S. used video games regularly, so much so that her mother called M.S.'s use a "technology addiction." *Id.* ¶¶ 27, 27 n.19. At one point, M.S. took "her father's credit card without permission to spend large sums of money on a video game." *Id.* ¶ 27.

### 3. *Neuropsychological Evaluation During Fourth Grade*

Midway through M.S.'s fourth-grade year, Dr. Yangfeifei Gao and Dr. Kristina Hardy of Children's National Hospital began a comprehensive set of neuropsychological tests of M.S. *Id.* ¶¶ 31–32. Their testing, completed in late February 2021, showed M.S. to be in the "average range overall for intellectual functioning, with well-balanced visual and verbal skills[;] . . . relative strength in working memory; and age-appropriate skills in verbal learning and memory, and nonverbal problem solving." *Id.* ¶¶ 33–34. The testing also revealed various weaknesses: M.S. scored poorly for attention, executive functioning, visual motor skills, emotional functioning, adaptive skills, functional academics, and self-care skills. *See id.* ¶ 35. The doctors diagnosed M.S. with a "specific learning disability" impairing her reading fluency, ADHD, developmental-coordination disorder, and major depressive disorder with anxious distress. *Id.* ¶ 37. They also emphasized the importance of supporting her mental well-being, recommending that MCPS keep her in small-group and socio-emotional learning environments. *Id.* ¶ 39. Without such interventions, they opined, M.S. would likely disengage. *Id.* The doctors also recommended that the school psychologist be involved in M.S.'s IEP team and education due to M.S.'s

8

psychiatric symptoms. *Id.* ¶ 40. Further, the doctors recommended that M.S. receive reading intervention to target fluency. *Id.* ¶ 42.

### 4. *Ending Fourth Grade & the First Half of Fifth Grade at Westbrook*

By the end of M.S.'s fourth-grade year, in-person learning had resumed, which M.S. welcomed. *Id.* ¶ 28. Throughout her fourth-grade year, M.S. had missed only seven-and-a-half days of school. *Id.* ¶ 29. Yet her health troubles continued. And in summer 2021, just after fourth grade ended, M.S. was again briefly hospitalized, twice. *Id.* ¶ 30.

For fifth grade, the 2021–2022 school year, M.S. continued in Westbrook's SESES program. *Id.* ¶ 52. She was the only girl in her class. *Id.* ¶ 53. For the first three months, M.S. seemed to enjoy fifth grade. *See id.* ¶ 54. But challenges emerged, first manifesting as frustration with her classmates and class work, then as shutting down, refusing to engage with anyone at school. *Id.* The situation worsened when staffing changes led to her class absorbing part of a third-grade SESES class. *Id.* ¶ 55. Some of the new students had their own behavioral challenges, exacerbating M.S.'s. *Id.* To help M.S. cope with the new class dynamic, the school continued its strategies such as adult support, walking breaks, and music. *Id.* The school also offered alternative workspaces to M.S., away from the new students, but M.S. wanted to stay in her classroom with her teacher. *Id.* ¶ 56.

By November 2021, M.S.'s parents had a hard time getting her to go to school. *Id.* ¶ 57. That month went from bad to worse. A student in M.S.'s class knocked a desk over near her. *Id.* ¶ 58. M.S. was scared to return to school. *Id.* ¶ 59. A few days later, another student threw a milk carton that hit M.S. in the head. *Id.* ¶ 62. In the same month, yet

another student hurt M.S.—this time intentionally—digging his nails into her hand until she bled. *Id.* ¶ 63.

### 5. *Midway Through Fifth Grade, Planning for Sixth*

That same month, in November of M.S.'s fifth-grade year, M.S.'s IEP team met for her annual review. *Id.* ¶ 44. As it did at every IEP meeting, MCPS informed M.S.'s parents of their procedural rights under the IDEA. *Id.* ¶¶ 45, 45 n.20. M.S.'s primary disability remained the same. *Id.* ¶ 46. The team identified needs in reading comprehension, reading fluency, written-language mechanics, and social-emotional behavioral skills. *Id.* The IEP included goals, objectives, accommodations, and supports such as small-group instruction throughout the day, outside of general-education classrooms. *Id.* ¶¶ 47–49. Still, the IEP included some general-education instruction. *See id.* ¶ 50 (noting 19 hours of self-contained instruction versus 10 hours of general-education instruction). The team agreed that Westbrook's SESES program continued to be the least restrictive environment consistent with M.S.'s IEP. *Id.* ¶ 51.

Around the time of that November 2021 IEP meeting, M.S.'s parents began researching middle-school options. *Id.* ¶ 60. In January 2022, after reviewing the middle-school SESES program, M.S.'s parents expressed to MCPS their concern that the middle-school SESES program would not fit M.S.'s needs. *Id.* They decided, instead, to apply to private schools for the fall. *Id.*

In February 2022, M.S. refused to attend school more often, citing other students' bad behaviors in classrooms and on the bus. *Id.* ¶ 61. That month, after M.S. told another student that he could not play in her game, the student threw rocks at M.S.—he missed, thank goodness—and threatened to kill her. *Id.* ¶ 64. School "staff appropriately

addressed each . . . incident," but by March, M.S. refused to return to Westbrook. *Id.*
¶ 65–66. She missed weeks of school. *Id.* ¶ 66.

### 6. *End of Fifth Grade: Amending the IEP and Choosing a Middle School*

In May 2022, as M.S. approached the end of fifth grade, her IEP team met to dis-
cuss her transition to middle school. *Id.* ¶¶ 68, 70. They evaluated observational and
quantitative data about M.S. as well as input from the parents and from middle-school
representatives. *Id.* ¶ 71. The team amended the November 2021 IEP but only slightly.
*Id.* ¶ 72. Her primary disability remained a "specific learning disability" and an "other
health impairment," which, the team determined, affected M.S.'s reading comprehen-
sion, reading fluency, written-language mechanics, self-management, social-emotional
behavioral skills, social-interaction skills, and task completion. *Id.* The team also added
her anxiety about school attendance to the IEP, but the IEP did not include an attend-
ance goal. *Id.* ¶¶ 73–75. The team decided that M.S. needed self-contained instruction
for all subjects. *Id.* ¶ 77. And although the amended IEP required counseling services, *id.*
¶ 77, it "did not provide for mental-health therapy or additional therapeutic services," *id.*
¶ 78.

As M.S.'s parents had suggested, the IEP team found that MCPS's middle-school
SESES program would not fit M.S.'s needs. *Id.* ¶ 79. Instead, the school-based team
members recommended that M.S. attend the Bridge program at Hoover Middle School.
*Id.* Bridge offers a self-contained environment with small classes (typically five to ten
students) within a larger middle school. *Id.* ¶ 82. Bridge students leave the self-con-
tained environment only during lunch, physical education (which is not with general-
education students), and, if they choose to participate, extra-curricular activities. *Id.*

¶¶ 82–83. Otherwise, the students learn in the Bridge suite, a group of classrooms that include offices with a social worker and a psychologist. *Id*. ¶ 83. Bridge classes, which always have a certified special-education teacher and at least one paraeducator, teach students who are academically capable and can access on- or above-grade-level instruction. *Id*. ¶¶ 84–85. The classes also teach social skills, coping skills, and anxiety reduction for socially vulnerable students. *Id*. ¶ 86.

The school-based team believed that Bridge would allow M.S. "to be in a self-contained setting for all periods of the instructional day." *Id*. ¶ 79. Plus, students at Bridge had fewer outbursts than those at SESES. *Id*. M.S.'s parents, however, disagreed with that recommendation. *See id*. ¶ 80. They were concerned about placing her in a comprehensive-school building and advocated, instead, for a more therapeutic environment. *Id*. The parents were also concerned by the fact that, in what would be M.S.'s sixth-grade year, 2022 through 2023, nearly all Bridge students were boys. *Id*. ¶ 88. The parents requested a referral to MCPS's Central Office IEP team to seek a "more restrictive placement" for middle school. *Id*.

In May 2022, the same month as M.S.'s final IEP meeting at Westbrook, M.S.'s parents hired an educational consultant, Dr. David Gold. *Id*. ¶ 90. Dr. Gold reviewed M.S.'s records, interviewed M.S. and her parents, and then recommended that M.S. attend Trails Carolina, a residential wilderness therapy program in North Carolina. *Id*. ¶ 91.

In July 2022, the summer after fifth grade, M.S.'s parents told MCPS they intended to enroll their daughter in Trails Carolina. *Id*. ¶ 92. They requested funding for the private school, but MCPS denied the request *Id*.

M.S. began at Trails Carolina that month, where she received various therapeutic and academic services. *Id.* ¶ 93. In August, her parents notified MCPS that M.S. would transition from Trails Carolina to Lake House Academy—another boarding school in North Carolina—and again requested funding. *Id.* ¶ 94; Summ. J. Hr'g Tr. (Tr.) 13, ECF No. 38. MCPS denied that request as well. *Id.* ¶ 98.

M.S. completed Trails Carolina in late August 2022 with strong grades. *Id.* ¶ 95. Her therapist at Trails Carolina noted her strengths and areas for continued support, including small class sizes, one-on-one instruction, and therapy. *Id.* ¶¶ 96–97.

### 7. *Lake House Academy for Sixth Grade*

In September 2022, M.S. began attending Lake House, a private school that works with students in sixth through tenth grade. *Id.* ¶¶ 105–06. Lake House focuses on therapy rather than traditional academic curriculum and is, thus, helpful for students with mental health issues and disabilities. *Id.* ¶¶ 107–08. While instructors at Lake House are not certified teachers, they each have a degree in the content area they teach. *Id.* ¶ 109. Classes are small, with a teacher-to-student ratio averaging one to six. *Id.* The curriculum is flexible, and students participate in core subjects (e.g., math, reading) as well as art and therapy-based health and mindfulness programs. *Id.* ¶ 110. Adventure programming and family therapy are also included. *Id.* ¶¶ 111–12. M.S. was successful at Lake House and graduated in August 2023. *Id.* ¶ 113; *see* Tr. 12–13.

### 8. *The September and December 2022 IEP Meetings*

In August 2022, M.S.'s parents had an additional evaluation conducted by Dr. Elizabeth Schall. *See id.* ¶¶ 99–104. After her review, Dr. Schall maintained M.S.'s previous diagnoses and diagnosed M.S. with autism (mild in severity) as well as with major depressive disorder with anxious distress in partial remission. *Id.* ¶¶ 99, 101. In

September, M.S.'s IEP team met to review Dr. Schall's report along with measures of academic progress, teacher reports, and parental input. *Id.* ¶¶ 114, 116. M.S., the team found, still qualified for special education under the same primary disabilities. *Id.* ¶ 117. But the agreements stopped there. The school-based members of the IEP team proposed new evaluations; they found that Dr. Schall's report lacked certain data to discern whether M.S. met the criteria for her IEP to recognize autism as a disability. *Id.* ¶ 118. But a representative from Lake House said their school did not conduct formalized academic assessments. *Id.* ¶ 119. And M.S.'s parents did not want to pull M.S. from school in North Carolina for testing. *Id.* ¶ 120. The IEP team did not amend the IEP at that meeting. *Id.* ¶ 121.

In December 2022, the IEP team met again. *Id.* ¶ 122. M.S.'s parents had not authorized the assessments recommended in September by the school-based members, fearing more testing would disrupt M.S.'s growth at Lake House. *Id.* ¶ 124. MCPS did not agree to fund private assessments or assess M.S. in North Carolina. *Id.* ¶ 125. So M.S.'s parents decided they would provide private assessments. *Id.* By the end of this meeting, M.S.'s IEP had not changed. *See id.* ¶ 126. The team discussed the possibility of MCPS providing "partial assessments." *Id.* ¶ 127.

The following month, January 2023, Dr. Carlyn Daubs conducted a private psychological evaluation of M.S. to test her cognitive and educational functioning. *Id.* ¶ 128. Dr. Daubs diagnosed M.S. with moderate ADHD and developmental-coordination disorder. *Id.* ¶ 131. She also made many recommendations for M.S.'s education, *see id.* ¶ 132, and acknowledged M.S.'s social and emotional needs, *see id.* ¶ 133.

### 9.  *Another Evaluation and IEP Meeting*

During M.S.'s spring break from Lake House, she returned to Maryland, and her parents consented to an MCPS evaluation. *Id.* ¶ 134. Psychologist Brian Stefanovic evaluated M.S., interviewing her parents and reviewing records including classroom observations, and autism and behavior assessments, previously completed by her parents and teachers. *Id.* ¶¶ 135–36. Mr. Stefanovic identified symptoms of an "other health impairment" (ADHD), emotional disability, and autism. *Id.* ¶ 138. He recommended, among other supports, continued special-education services and a small-group social-emotional learning classroom. *Id.* ¶ 139.

A week later, the IEP team met to review Dr. Daubs's and Mr. Stefanovic's evaluations. *Id.* ¶¶ 141, 143. The team found that M.S. continued to qualify as having an "other health impairment" but no longer qualified as having a "specific learning disability." *Id.* ¶ 144. The team also noted that M.S. displayed characteristics of autism, *id.* ¶ 145, and that M.S. met the criteria for an emotional disability, *id.* ¶ 146.

That same month, the IEP team met to revise M.S.'s IEP. *Id.* ¶ 152. The team reviewed input from various sources, including Lake House staff, her parents, and assessments performed at Lake House. *Id.* ¶¶ 154, 157. The team also agreed on goals and objectives, supplementary aids and services, assessment accommodations, a self-contained setting for M.S.'s instruction, and counseling services. *Id.* ¶¶ 155–60. But "[t]he IEP did not provide for mental health therapy or other therapeutic services." *Id.* ¶ 161.

The school-based team continued to recommend the Bridge program. *Id.* ¶ 162. Though her parents agreed that a self-contained setting was appropriate, they did not think Bridge fit M.S. given its gender makeup (almost all—if not all—boys) and M.S.'s still fragile mental health. *See id.* ¶ 163.

### 10.    *Seventh Grade to Present*

For seventh grade, the 2023–2024 school year, M.S.'s parents enrolled her in Commonwealth Academy, a private day school in Alexandria, Virginia. *Id.* ¶ 166; Tr. 13, 44–45. Commonwealth is not approved by the State of Virginia as a special-education school, as noted in the hearing before Judge Messitte, *see* Tr. 58, but it does serve students "of average to gifted ability who have ADHD, executive functioning challenges, and mild learning differences," Commonwealth Academy, *Mission & Values*, https://www.commonwealthacademy.org/about/mission-values (last visited Mar. 19, 2025).

M.S. is now in eighth grade. She still attends Commonwealth. Tr. 48, 59.

## C.  Procedural History

On April 4, 2023, M.S.'s parents filed a due process complaint with Maryland's Office of Administrative Hearings. ALJ Decision ("Decision") at 1. Their complaint alleged that MCPS had not provided M.S. a FAPE for the school years beginning in fall 2022 and 2023, her sixth- and seventh-grade years, respectively. *Id.* at 48. Under this theory of liability, the parents sought reimbursement for the costs of private evaluations and the tuition and costs of Trails Carolina and Lake House Academy. *See id.* at 49; ECF No. 24-1 at 1. They also sought placement for M.S. at Commonwealth Academy for the 2023–2024 school year and that MCPS pay related tuition and costs. Decision at 49; ECF No. 24-1 at 10.

The ALJ conducted a prehearing conference in May 2023 and then issued a Prehearing Conference Report and Order. Decision at 1–2. Over six days in June and July 2023, she held a due process hearing. *Id.* at 2. At the hearing, M.S. called five witnesses: (1) her mother; (2) Dr. Kristen Eccleston, admitted as an expert in special education

with an emphasis on the educational needs of emotionally disabled children; (3) Mary Keyzer, the academic director of Lake House, admitted as an expert in education, instruction, programming, and administration; (4) Nadia Hernandez, a therapist from Lake House, admitted as an expert in mental health counseling; and (5) Dr. Gold, a psychologist and educational consultant, admitted as an expert in clinical psychology and therapeutic residential placements. *Id.* at 4. MCPS called three witnesses: (1) Heather Strauss, an itinerant resource teacher in MCPS's Department of Special Education Services, admitted as an expert in special education with an emphasis on emotional disabilities and autism; (2) Lee Gilliam, M.S.'s special-education teacher at Westbrook, admitted as an expert in special education with an emphasis on emotional disabilities; and (3) Christina Anderson, a special-education resource teacher at MCPS's Bridge program, admitted as an expert in special education. *Id.* at 4–5. The ALJ also considered more than 80 exhibits, including affidavits, psychological evaluations, and various iterations of M.S.'s IEP. *E.g.*, *id.* at App. II, Ex. List; *id.* at 22 n.22 (referring to Dr. Schall's psychological evaluation of M.S. in August 2022); *id.* at 31 n.25 (referring to Dr. Daubs's psychological evaluation of M.S. in January 2023); *id.* at 54 n.83 (referring to a June 2023 letter from M.S.'s psychiatrist, Dr. Brett Schneider, about M.S.'s symptoms that suggest a need for residential placement).

In a highly detailed, 68-page written decision issued on August 25, 2023, the ALJ denied the parents' claims. *Id.* at 68. The ALJ found that MCPS had offered a FAPE to M.S. for both school years at issue. *Id.* at 67–68. MCPS, the ALJ concluded, had complied with federal and state regulations governing reevaluations for special education, and M.S.'s parents had not proven otherwise. *See id.* at 52. The ALJ concluded that the IDEA did not require MCPS to provide a residential placement to M.S.; Bridge sufficed.

*Id.* at 68 ("I am persuaded that Bridge is an appropriate placement and constitutes the least restrictive environment based on the Student's IEP and her unique needs and circumstances."). In sum, the ALJ concluded that M.S.'s parents had not met their burden to show that MCPS had failed to comply with its responsibilities under the IDEA. *Id.* at 67–68.

M.S.'s parents, individually and on M.S.'s behalf, now seek this Court's review of the ALJ's decision.

## II. STANDARD OF REVIEW

As noted, *see supra* § I(A), if aggrieved parents have exhausted state procedures and contend that their outcome violates the IDEA, the parents may obtain judicial review in federal court. *See G.M.*, 114 F.4th at 330. Typically, as here, the parents' and the school system's arguments are presented through briefs addressing the parties' respective positions.[4] The district court "conduct[s] a modified de novo review" of the administrative record, "affording 'due weight' to the state administrative proceedings." *G.M.*, 114 F.4th at 333–34 (citing *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002)). This means that so long as the ALJ made findings of fact "in a

---

[4] Typically such briefs, as here, are entitled cross-motions for summary judgment. That label has been described as "a procedural misnomer." *G.M.*, 114 F.4th at 333 n.2 (quoting *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 516–17 (4th Cir. 2014)). But regardless of the label for the parties' filings in IDEA cases in federal court, the district court "(1) receive[s] the record of the administrative proceeding, (2) hear[s] additional evidence at the request of a party, and (3) base[s] its decision on the preponderance of the evidence," considering both the ALJ's findings of fact and the additional evidence. *G.M.*, 114 F.4th at 334 n.3 (quoting 20 U.S.C. § 1415(i)(2)(C)). Having taken steps 1 and 2, the Court here takes step 3.

regular manner and with evidentiary support," those findings "are entitled to be considered *prima facie* correct." *Doyle*, 953 F.2d at 105.

To assess whether findings were "regularly made," the Court focuses on *how* the ALJ made the findings, not on *what* the ALJ found. *See G.M.*, 114 F.4th at 334 (citing *Bouabid v. Charlotte-Mecklenburg Sch. Bd. of Educ.*, 62 F.4th 851, 857 (4th Cir. 2023)). "[F]indings are regularly made if the hearing officer 'conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case.'" *Id.* at 334 (quoting *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty.*, 516 F.3d 254, 259 (4th Cir. 2008)). Only if the "ALJ has strayed so far from the accepted norm of a fact-finding process that [the ALJ's] findings were not regularly made" would a court not rely on an ALJ's findings. *Bouabid*, 62 F.4th at 857 (quotations omitted). And if the district court *does* decide not to follow the ALJ's findings, it must explain why. *Doyle*, 953 F.2d at 105. *But see Springer v. Fairfax Cnty. Sch. Bd.*, 134 F.3d 659, 663 n.* (4th Cir. 1998) (noting that an ALJ's opinion "has no special claim to deference" when her opinion "was both cursory and conclusory").

With due weight given to ALJs' findings and any additional evidence supplied, courts decide IDEA appeals based on the preponderance of the evidence. *G.M.*, 114 F.4th at 334. Yet a court must be careful not to "substitute [its] own notions of sound educational policy for those of local school authorities." *Id.* (quoting *Hartmann ex rel. Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir. 1997)). So when the parents' and school system's experts disagree, the "IDEA requires great deference to the

views of the school system rather than those of even the most well-meaning parent."
*A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004).

When, in an IDEA case, cross-motions for summary judgment are filed, the general standards of review for summary judgment motions also apply: The moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a moving party has made that showing, the Court must consider the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Bollech v. Charles Cnty.*, 69 F. App'x 178, 180 (4th Cir. 2003) (citation omitted).

### III. DISCUSSION

Plaintiffs here advance two arguments: that the ALJ's findings of fact were not regularly made, and that MCPS failed to offer M.S. a FAPE in the 2022–2023 and 2023–2024 school years. The Court concludes that the ALJ's findings were regularly made and therefore deserve deference. Relying on those findings, the Court then concludes that MCPS offered M.S. a FAPE in compliance with the IDEA.

### A. Whether the ALJ's Findings of Fact Were Regularly Made

As noted, *see supra* § II(A), to decide whether to defer to an ALJ's findings, courts look to whether those findings were "regularly made." *G.M.*, 114 F.4th at 330. Whether a decision has been "regularly made" is defined by the "*process* through which the findings were made, not the results of that process." *Id.* at 334 (internal citations omitted). The decision-making process is "regular" if the hearing officer

"conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating [her] responsibility to decide the case." *J.P.*, 516 F.3d at 259.

### 1. *The ALJ's Findings Were Regularly Made*

Here, Plaintiffs argue that the ALJ "made findings throughout her decision that are divorced from the facts, leading to legal errors that require reversal." ECF No. 24-1 at 11. Applying the relevant standard of review, their argument is that the ALJ's findings were irregularly made because they are not based on the facts presented to her. *See id.* The Court reads the record differently.

The ALJ made her findings regularly, following all necessary requirements. She conducted a proper hearing, allowed both parties to present evidence and make arguments, explained which testimony she agreed or disagreed with and why, and resolved factual questions through logic, never "abdicating [her] responsibility to decide the case." *J.P.*, 516 F.3d at 259; *see also G.M.*, 114 F.4th at 334 ("The ALJ conducted a six-day hearing during which both sides were allowed to present evidence and arguments."). After the hearing, the ALJ wrote a detailed, well-reasoned decision with each of her conclusions supported by the record. *See J.P.*, 516 F.3d at 262. The ALJ's decision recognized the testimony of both parties' witnesses. *See* Decision at 53–65 (noting testimony for Plaintiffs from M.S.'s parents, Dr. Eccleston, and Dr. Gold, and for Defendants from Ms. Strauss, Mr. Gilliam, and Ms. Anderson). And her decision relied on evidence from both parties. *See, e.g.*, *id.* at 51 n.73 (citing both parties' exhibits of M.S.'s IEP), 51 n.76 (citing both parties' exhibits of notices from MCPS to the parents), 54 n.83 (citing the parents' exhibit of a psychiatrist's letter about M.S.'s need for therapeutic placement),

63 n.90 (citing the parents' exhibit of email correspondence between the parents and MCPS). Further, the decision included the relevant legal standards, the ALJ's findings of fact, and the legal conclusions. *J.P.*, 516 F.3d at 262. In short, the ALJ's factual findings were regularly made. Because the proceedings were not "far from the accepted norm," the ALJ's findings of fact are entitled to a presumption of correctness. *G.M.*, 114 F.4th at 334 (citations omitted).

### 2. *Plaintiffs' Specific Claims of Factual Error*

Plaintiffs present three[5] discrete arguments about the ALJ's findings of fact.

### a. *The Weight the ALJ Gave to MCPS's Testimony About the Bridge Program*

Plaintiffs contend that the ALJ relied "almost exclusively," or even "solely[,] on MCPS's witnesses to conclude that Bridge was able to meet M.S.'s needs." ECF No. 24-1 at 19. Framed as a challenge to how the ALJ made her findings of fact, Plaintiffs essentially argue that the ALJ ignored their witnesses' testimony. Entirely ignoring credible testimony would likely be irregular fact finding. *See J.P.*, 516 F.3d at 259. So, the argument goes, the ALJ's findings about Bridge were irregularly made and, thus, do not deserve deference. Instead, Plaintiffs argue, they offered reliable testimony about M.S.'s need "to attend a therapeutic program" by calling witnesses who know M.S. personally. *See* ECF No. 24-1 at 21. In sum, they argue that the ALJ should not have deferred to MCPS's position that M.S. did not need therapeutic placement but to Plaintiffs' position that she did. *See id.* at 23.

---

[5] Plaintiffs' argument regarding M.S.'s school refusal, ECF No. 24-1 at 23–25, and their argument regarding the student population at Bridge, *id.* at 25–26, are addressed together, *see infra* § III(A)(2)(b).

Deciding which testimony is more credible, and thus deserves more weight, is inherent in fact finding. *See Sch. Bd. of Henrico Cnty. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 305 (4th Cir. 2005) (citation omitted). Credibility determinations are the purview of the ALJ, so the Court treats them as "*prima facie* correct . . . so long as the findings were regularly made." *G.M.*, 114 F.4th at 334 (quotation omitted). As established above, the ALJ's findings were regularly made—including with respect to the question of whether Bridge could provide appropriate services to M.S.

The ALJ did not ignore Plaintiffs' witnesses—not close. She explained in detail their positions and, if she disagreed with them, why she did. *See, e.g.*, Decision at 55 (discussing Dr. Eccleston's testimony and why she disagreed with Dr. Eccleston's conclusion), 58 (discussing Dr. Gold's testimony and why it merited less weight), 59 (discussing Dr. Schall's report and why it did not directly apply to her decision about M.S.'s education). But "[e]ven if the written decision had not referenced [plaintiffs' experts'] testimony, [the Court] would not infer that the ALJ failed to consider it." *G.M.*, 114 F.4th at 335. The IDEA does not require ALJs "to address every data point in the record for their findings to be regularly made. *Id.* (citing *J.P.*, 516 F.3d at 262). Instead, the Court can deem an ALJ's findings to have been regularly made even if the ALJ gives only "bare-boned" explanations. *See J.P.*, 516 F.3d at 262. And here, as noted, the ALJ went well beyond that minimum expectation and explained why she was not persuaded by the witnesses whose testimony Plaintiffs incorrectly contend the ALJ "ignored," *see* ECF No. 24-1 at 11.

Moreover, MCPS provided sufficient evidence for the ALJ to find that Bridge would meet the IDEA's requirements for M.S.'s education. Plaintiffs claim "MCPS witnesses offered little to no evidence as to what Bridge could do that had not already been

tried." ECF No. 24-1 at 19. But that is not what the record reflects. MCPS provided evidence that Bridge differed from M.S.'s previous MCPS placement in Westbrook's SESES program. For example, MCPS explained that students at Bridge do not generally exhibit externalizing behaviors like those in Westbrook's SESES program that triggered M.S.'s anxiety. *See* Decision at 61; ALJ Facts ¶ 87 ("The Students in Bridge typically display primarily internalized behaviors, rather than externalized behaviors."). Bridge, unlike SESES, *see* ALJ Facts ¶ 18, suits "'students [like M.S.] who are more socially vulnerable, may have awkward social skills, may be more socially immature and may have more anxiety and internalizing presentations to their social and emotional needs.'" Decision at 61 (quoting testimony by Ms. Strauss, Due Process Hr'g Tr., vol. 4, 522–33). Plus, Bridge offered the supports that Westbrook had and that M.S. likely required: immediate access to a social worker and a psychologist, with offices within its suite of classrooms, ALJ Facts ¶¶ 83, 89; "specially designed instruction to students who are academically capable," *id.* ¶ 84; self-contained special-education classes of only five to ten students, *id.* ¶¶ 82, 85; and group and individual counseling as needed, *id.* ¶ 89.

For these reasons, Plaintiffs are incorrect that the ALJ ignored their witnesses and based her finding on Bridge's appropriateness on "little to no evidence."

### b. *The ALJ's Interpretation of M.S.'s Refusing to Attend School and Plaintiffs' Concern About Bridge's Gender Composition*

Contrary to Plaintiffs' contention, *see* ECF No. 24-1 at 23–26, the ALJ also adequately addressed M.S.'s refusal to attend school and MCPS's plan to address it. The ALJ discussed the parents' concern that M.S. would not attend Bridge because she would almost certainly be the only female student. Decision at 62. After stating that she understood the parents' concern, the ALJ found that it was "mere conjecture." *Id.* at 62–

63. Although it is true, the ALJ wrote, that "the Student did not like that there were all boys in her class," Plaintiffs did not present evidence that M.S. would refuse to attend Bridge *because* it contained only boys. *Id.* at 62. As the ALJ explained, M.S. wanted to leave Westbrook, but that was more likely because of third graders' externalizing behaviors than her class's gender composition. *See id.* at 61, 63. And because M.S. has not recently attended a school meaningfully distinct from Westbrook SESES—like Bridge, *see supra* § III(A)(2)—the ALJ could not know with sufficient confidence that M.S.'s school refusal would continue.

Because of those differences, Mr. Gilliam, M.S.'s teacher of two years—as well as the rest of the school-based members of the IEP team—recommended Bridge over MCPS's middle-school SESES program. *See* Decision at 64–65. Thus, MCPS did not fail to address M.S.'s refusal to attend "several weeks of school," ALJ Facts ¶ 61, Decision at 61, during the spring of her fifth-grade year. Instead, MCPS viewed Bridge as the least restrictive environment in which to adequately address M.S.'s needs, including the challenges that led her to refuse to attend school during that period. *See* Decision at 64–65. Residential placement, they opined, was neither necessary nor appropriate under the least-restrictive-environment requirement, 20 U.S.C. § 1412(a)(5); Md. Code Reg. 13A.05.01.10. *See* Decision at 64–65.

After hearing evidence and argument from both sides, the ALJ found that MCPS had indeed planned on addressing M.S.'s attendance issues, whatever the cause, and that Plaintiffs had not shown that the Bridge program would have been insufficient to adequately address M.S.'s needs. Giving the deference due to those regularly made factual findings, the Court does not disturb them.

### c. *The ALJ's Interpretation of MCPS's Evaluations, or Lack Thereof*

Plaintiffs further argue that MCPS "never requested updated evaluations" for M.S. during her fourth- and fifth-grade years. But those years are not at issue. Decision at 3. Instead, Plaintiffs' due process complaint contended that MCPS had failed to provide a FAPE during M.S.'s middle-school years. *Id.*

Further, the IDEA gave M.S.'s parents a remedy if they felt their daughter needed more testing: "A local educational agency shall ensure that a reevaluation of each child with a disability is conducted . . . if the child's parents or teacher requests a reevaluation." 20 U.S.C. § 1414(a)(2). But they never requested a reevaluation, at least not during M.S.'s fourth- and fifth-grade years. Decision at 51. And while schools may have "an affirmative obligation to 'conduct a full and individual *initial* evaluation' of an eligible student *'before' it begins providing services*," *Z.B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018) (emphasis added) (quoting 20 U.S.C. § 1414(a)(1)(A)), here, M.S.'s services had already begun. Decision at 51.[6] The parents did not request that MCPS conduct a reevaluation of M.S. before her IEP meetings or request reevaluations at any point in those two years. *See* Decision at 51. *But see* ECF 24-1 at 7 (noting that when M.S. was in sixth grade "[t]he parents asked the school system to explain why no testing had been completed while she was attending MCPS [in fourth and fifth grade]"). Had

---

[6] Plaintiffs, through their counsel, omit the end of this quote from the *Z.B.* case, italicized above. ECF No. 24-1 at 27 (stating that "schools have, 'an affirmative obligation to "conduct a full and individual initial evaluation" of an eligible student'" (citation omitted)). They appear to imply MCPS had a legal duty to *re*-evaluate M.S. during her fourth- and fifth-grade years, even absent a request from the parents for such reevaluation. It did not. *See* 20 U.S.C. § 1414(a)(2)(A)(i) (requiring a school system to reevaluate a qualifying child "*if* the [school system] determines that the educational or related services needs . . . of the child warrant a reevaluation" (emphasis added)).

MCPS found a reevaluation necessary to inform the IEP process, it could have reevaluated M.S. 20 U.S.C. § 1414(a)(2)(A)(i). But MCPS determined that it had sufficient data. Decision at 51. And—as the record shows and the ALJ noted—when MCPS did not have sufficient data, it sought to reevaluate M.S. *Id.* at 51–52.

*     *     *

For these reasons, the ALJ's findings of fact were "regularly made," *G.M.*, 114 F.4th at 330, and the Court must treat them as "*prima facie* correct." *Doyle*, 953 F.2d at 105.

## B. Whether MCPS Provided M.S. a FAPE

Plaintiffs' other principal argument is that even if the ALJ's findings of fact were regularly made and entitled to deference, the ALJ erred in concluding that MCPS offered M.S. a free appropriate public education. The Court disagrees. The record amply supports the ALJ's conclusion that MCPS offered M.S. a FAPE during both school years at issue.

### 1. *The 2022–2023 School Year*

Plaintiffs argue that MCPS denied M.S. a FAPE for the 2022–2023 school year because although MCPS recommended the Bridge program, only a *residential* program would provide M.S. sufficient services and support to comply with the IDEA's requirements. *See* ECF No. 24-1 at 11 ("At the root of this case is a disagreement as to whether M.S. required a residential program and placement under the IDEA in order to receive an appropriate education for the 2022-2023 school year."). The question for the Court, then, is whether Plaintiffs have proven by a preponderance of the evidence that Bridge would *not* have been an appropriate education. *See G.M.*, 114 F.4th at 334. To find the answer, the Court defers to the ALJ's findings of fact and to any "cogent and responsive

explanation[s]" that educators gave for their instructional choices. *See Endrew F.*, 580 U.S. at 404.

For MCPS to offer M.S. a FAPE, it had to provide M.S. with "specially designed instruction, at no cost to [M.S.'s] parents, to meet [her] unique needs" as well as whatever supports she required to benefit from that instruction. 20 U.S.C. § 1401(26), (29); *see Endrew F.*, 580 U.S. at 390. MCPS did not have to provide the *best possible* education. *See G.M.*, 114 F.4th at 342.

Plaintiffs and MCPS agreed, almost entirely, on what M.S. needed to meet her unique needs. *See* ALJ Facts ¶¶ 68–81. They agreed that MCPS's middle-school SESES program (an extension of Westbrook SESES) was not the right fit for M.S. as it "did not have the services necessary to support" her. *Id.* ¶ 79. Instead, they agreed, M.S. "required instruction in a self-contained setting for all subjects for the 2022–2023 school year." *Id.* ¶ 77. This requirement differed drastically from her IEP a year prior. *See id.* ¶ 50 (requiring about one-third of M.S.'s instruction in a general-education setting). M.S. would also need different counseling services than before, with longer, but far fewer, sessions, and mostly with a psychologist. *Compare id.* ¶ 77 (requiring "two, forty-five-minute sessions of counseling services each month, to be provided by primarily by [sic] a psychologist with the support of a social worker"), *with id.* ¶ 50 (requiring "one, thirty-minute counseling session per week; as well as four, thirty-minute sessions per month of-social work services to be provided primarily by a school social worker, with the support of a school psychologist"). Yet the IEP team—parents included—determined not to include "mental-health therapy or additional therapeutic services" in M.S.'s IEP. *See id.* ¶ 78. Nor did the team include an attendance goal, *see id.* ¶ 75, despite M.S.'s recent weeks of refusing to attend school, *see id.* ¶ 66, and despite the IEP team's

discussion about "identifying a solution for the increase in her school avoidance," *id.*
¶ 73. In the end, the only disagreement over a FAPE for M.S. is whether it required a
residential, "therapeutic" placement (such as Trails Carolina and Lake House), or
whether the intensive, self-contained, non-residential Bridge program would suffice.

As the ALJ explained, Bridge has features that could have supported M.S. in her
sixth-grade school year. *See supra* § III(A)(2) (describing Bridge and how it differs from
alternatives). That is what the educators posited, and they supported those conclusions
and recommendations with cogent and responsive explanations. *See* ALJ Facts ¶ 79; De-
cision at 61–62 (recounting the benefits of Bridge, as explained by a veteran educator),
64–66 (discussing MCPS's expert explanations for why Bridge was an appropriate
placement for M.S.: Bridge offered supports for school-resistant but academically strong
students like M.S. and was the least restrictive environment that was sufficient to meet
M.S.'s unique needs). The Court, thus, defers to these educators, just as the ALJ did, as
is appropriate and indeed required under the case law. *See, e.g.*, *A.B.*, 354 F.3d at 328.
Plus, as the ALJ rightly notes, M.S. never attended Bridge. Decision at 55. Although, of
course, parents are not required to enroll students in programs they believe inadequate
in order to prove they are inadequate, in the circumstances here it was reasonable for
the ALJ to consider that fact including that Plaintiffs had not shown, by a preponder-
ance of the evidence, that the Bridge program could not have provided her a FAPE.

Still, Plaintiffs assert that "[t]here is simply no evidence . . . that M.S.'s needs
could be met in a less restrictive setting than residential." ECF No. 24-1 at 18. That is
wrong in two ways. First, Plaintiffs are the parties who bear the burden to prove that
M.S. required a residential setting to have an appropriate education. Second, as just dis-
cussed, there *is* evidence that Bridge, which was a less restrictive setting than the

residential settings M.S.'s parents sought, was sufficient to meet M.S.'s "unique needs," *see, e.g*., ALJ Facts ¶¶ 82–89. Plaintiffs were, and are, entitled to their belief, together with the experts they consulted, that *only* a residential program with therapeutic services such as Trails Carolina and Lake House would have provided what M.S. needed to thrive. And they obviously were entitled to make that choice for M.S. and enroll her in that program. But Plaintiffs have not shown by a preponderance of the evidence that the IDEA required MCPS to pay for M.S. to attend a residential, "therapeutic" placement during the 2022–23 school year in order to comply with its obligation to provide M.S. a FAPE.

### 2.  *The 2023–2024 School Year*

The appropriateness of M.S.'s IEP and placement for the 2023–2024 school year appears nearly uncontested. The plaintiffs devote little to challenging it. *See* ECF No. 24-1 at 30 (arguing, briefly, that Plaintiffs' witnesses believed "M.S. was not ready to return to a large, comprehensive middle school"); *see also* ECF No. 27 at 3–7, 15 (mentioning "the IEPs at Issue" and requesting funding for the 2023–2024 school year, but only discussing the IEP for the 2022–2023 school year); ECF No. 35 at 3, 10 (noting that by January 2023, midway through sixth grade, M.S. "appear[ed] ready to transition to a more traditional environment for the next school year" and, without further discussion of the 2023–2024 IEP, requesting funding for the 2023–2024 school year). This is likely because the IEP for 2023 through 2024 closely resembled the IEP from the year before, *compare* ALJ Facts ¶¶ 68–81, *with id*. ¶¶ 152–65, except this time, the parents did not request a residential placement. Still, they argued, MCPS's recommendation of Bridge did not suffice. *Id*. ¶ 163. Instead, M.S. required "smaller classes, social and emotional support and the instruction needed to continue to build her executive functioning

skills" outside "a large, comprehensive middle school." ECF No. 24-1 at 30. But, in essence, that is what Bridge is. *See supra* § III(A)(2).

With M.S.'s required supports largely the same and both parties in agreement that residential placement was not required, the Court concludes that MCPS offered M.S. an appropriate education for her 2023–2024 school year.

\*       \*       \*

To obtain a court-ordered reimbursement for private education, plaintiffs must show that their public school failed to provide their child a FAPE. *See Florence Cnty. Sch. Dist.*, 510 U.S. at 15. MCPS offered M.S. a FAPE for both school years at issue. So here, contrary to Plaintiffs' assertion, *see* ECF No. 24-1 at 28–30, they are not entitled to reimbursement.

## IV. CONCLUSION

No parent wants to see their child suffer. For years, M.S.'s parents have worked for M.S. to receive appropriate supports in and out of school. Due to their efforts and those of educators, therapists, and tutors, private and public, M.S. appears to have surmounted many challenges. She now attends a non-residential school that specializes in college preparation for students with mild learning differences.

In this suit, M.S.'s parents questioned whether MCPS met its federally imposed responsibility to provide their daughter an appropriate education. For the reasons stated, it has. Federal law does not require more than what MCPS offered M.S. and her parents.

Accordingly, Plaintiffs' motion for summary judgment, ECF No. 24, is **DENIED**;

Defendants', ECF No. 26, is **GRANTED**.


March 20, 2025                                    /s/
_____
                                         Adam B. Abelson
                                   United States District Judge